The FIELDS FOUNDATION, LTD., Plaintiff-Respondent and Cross-Appellant,

v.

Dennis D. CHRISTENSEN, Defendant-Appellant and Cross-Respondent.†

Court of Appeals

*No. 80–1975. Submitted on briefs March 10, 1981.—
Decided June 19, 1981.*
(Also reported in 309 N.W.2d 125.)

† Petition to review denied.

For the defendant-appellant and cross-respondent the cause was submitted on the briefs of *James A. Olson* and *Richard L. Cates* and *Lawton & Cates* of Madison.

For the plaintiff-respondent and cross-appellant the cause was submitted on the brief of *Roger L. Gierhart* and *Carroll Metzner* and *Bell, Metzner & Gierhart, S.C.* of Madison.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

GARTZKE, P.J. Fields Foundation operates Midwest Medical Center, an abortion clinic in Madison. Dr. Dennis Christensen was the Center's medical director from 1977 through 1979. Fields brought this action against Christensen to enforce a covenant not to compete in Christensen's employment contract and for damages for breach of that contract and for defamation. The covenant restricts Christensen from engaging in a medical practice or business which is similar to the type conducted at the Center within fifty miles of the state capitol in Madison for two years after termination of his employment.[1]

---

[1] The trial court entered a series of seven orders affecting various aspects of this suit and counterclaims by Christensen, the details of which need not be recited. Christensen has not appealed from orders which require him to account for fees received during his employment and to return records he removed from the Center.

The trial court enjoined Christensen from performing certain abortion-related activities but refused to enforce a liquidated damages clause in the covenant not to compete, and dismissed the defamation claim. Both parties have appealed.

Christensen contends that the covenant is not reasonably necessary to protect the employer, contains unreasonable restraints, is unduly harsh and contrary to the public interest, and that Fields is not entitled to equitable relief. Fields contends that the trial court properly enforced the covenant but should also have enforced the liquidated damages clause, that it is entitled to an accounting for abortions Christensen performed in violation of the covenant and that his defamatory statements were not substantially true. We affirm the trial court's orders in all respects.

1. *Covenant Reasonably Necessary To Protect Employer*

Section 103.465, Stats., provides:

A covenant . . . [not to compete in an employment contract] within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any such restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant or performance as would be a reasonable restraint.

The statute and the common law require this court to make five distinct inquiries in evaluating the enforceability of a covenant not to compete. The covenant must (1) be necessary for the protection of the employer; (2) provide a reasonable time restriction; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive as to the employee; and (5) not be contrary to public policy. *See Chuck Wagon Catering, Inc. v. Raduege,* 88

Wis.2d 740, 751, 277 N.W.2d 787, 792 (1979). Section 103.465, Stats., provides that any unreasonable portion of the covenant not to compete voids the entire covenant, even if the remaining portions would otherwise be enforceable.

■

This court's first inquiry is whether the employee has a protectable interest justifying any restriction on the employee's activities. *Lakeside Oil Co. v. Slutsky,* 8 Wis. 2d 157, 163, 98 N.W.2d 415, 419 (1959).

An employer is not entitled to be protected against legitimate and ordinary competition of the type that a stranger could give. There must be some additional special facts and circumstances which render the restrictive covenant reasonably necessary for the protection of the employer's business. *Id.*

Thus, "to enforce a restraint, the employee must present a substantial risk either to the employer's relationships with his customers or with respect to confidential business information." Blake, *Employee Agreements Not To Compete,* 73 Harv. L. Rev. 625, 653 (1960). Put somewhat differently, an employee's covenant not to compete is ordinarily unenforceable, except to prevent the use of trade secrets or customer lists or unless the employee's services "are of a unique character." *Behnke v. Hertz Corp.,* 70 Wis.2d 818, 821–22, 235 N.W.2d 690, 693 (1975), quoting *Restatement of Contracts* sec. 516, comment *h* on clause (f) at 1001 (1932).

■

The reasonableness of a covenant not to compete "involves the totality of the circumstances." *Hunter of Wisconsin, Inc. v. Hamilton,* 101 Wis.2d 460, 470, 304 N.W.2d 752, 757 (1981). The trial court's factual findings are therefore critical to appellate review.

■

The trial court did not make the formal findings or conclusions required by sec. 805.17(2), Stats. It discussed

the facts and law and its reasoning in a memorandum decision. An appellate court may look to the trial court's memorandum decision for findings and conclusions. *Termination of Parental Rights to T.R.M.*, 100 Wis.2d 681, 688, 303 N.W.2d 581, 583 (1981), and cases cited. Because the decision is detailed and extensive, we take from it the following facts, none of which are questioned on appeal:

Fields purchased the Center in January 1977. The Center's founders had struggled in its early years to build relationships with referral agencies and physicians and by mid-1977 had established the Center as a highly respected and well-run clinic with a trained, knowledgeable and dedicated medical and administrative staff. Christensen is an obstetrician and gynecologist. His abortion experience prior to joining the Center was limited to about five hundred abortions performed several years earlier in Minnesota. He had never lived or practiced in Wisconsin.

Christensen became the Center's medical director when he entered his contract with Fields June 2, 1977. The contract was to run until December 31, 1980 but ended in December 1979 when Christensen began an abortion clinic in Madison. He was the Center's only physician during most of his tenure.

Approximately eighty-one percent of the Center's abortion business is obtained through referrals, consisting of twenty-two percent from doctors, eighteen percent from former patients, twenty-nine percent from social service agencies and the balance from miscellaneous sources. Ten percent of its business consists of "repeat" patients and nine percent come through telephone contacts. During the average patient's two to three hour stay at the Center, she spends only five to ten minutes with the physician. Christensen had no regular contact with referral sources, but lists of Wisconsin physicians and family planning organizations are readily available elsewhere.

The trial court found that Christensen was nevertheless most interested in obtaining possession of the Center's referral lists. He photocopied the lists in 1979 to provide himself with a "base" from which to compete with the Center and made some contacts with referral agencies and physicians with respect to opening his own clinic.

The court found that Christensen's actions in copying referral lists, contacting referral sources and soliciting Center staff to join him in his competing practice illustrated the Center's interests which the covenant was designed to protect. The court found that when Christensen terminated his employment he had gained over two years' experience as the medical director of a well-known, well-respected and established abortion clinic, was so identified in his associations with the Madison medical community, and had become expert in the surgical procedures and knowledgeable in the operations of a highly specialized clinic. The court noted that the lists from which potential abortion referrals could be gleaned are generally available, as are monographs dealing with the establishment and operation of abortion clinics. The court found that the availability of those lists and monographs was not controlling in light of the other factors present and concluded that the restrictive covenant was reasonably necessary to protect the employer.

Its factual background having been established, whether the covenant not to compete is reasonably necessary to protect the employer is a question of law which may be resolved on appeal independently of the trial court's conclusion. *Behnke, supra.* We agree with the trial court's conclusion but not all of its reasons.

As other physicians performing similar services replaced him, Christensen's professional services lacked the uniqueness which might entitle the Center to protection. The experience and skill he gained during his employ-

ment does not justify a post-employment restriction. "In the absence of special circumstances the risk of future competition from the employee falls on the employer and cannot be shifted, even though the possible damage is greatly increased by experience gained in the course of the employment." Blake, 73 Harv. L. Rev. at 652. Our "law affords no recourse" against the departing employee who takes no more than his experience with him. *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis.2d 202, 214, 267 N.W.2d 242, 248 (1978).

Christensen's short and generally one-time contacts with patients would not make him a more formidable competitor than another doctor. The need for a protective covenant cannot be premised on the "customer contact" theory as enunciated in *Lakeside Oil Co., supra*, and *Chuck Wagon Catering, Inc., supra*. But as no fixed rule prevents protecting an employer "against the improper use of information about customers with whom the employee did not have actual contact," *Hunter of Wisconsin, Inc.*, 101 Wis.2d at 468, 304 N.W.2d at 756, no rule precludes protection to an employer dependent on referrals, even if the employee had no contact with those making referrals.[2]

Despite his limited patient contacts, Christensen's identification with the Center's considerable goodwill by those referring business to it provides him with significant advantages over other competitors. Having the referral lists enables Christensen to locate that part of the community most responsive to such goodwill.

It would be unfair to permit Christensen to use the Center's own assets—its goodwill plus its referral sources

---

[2] *Compare Geocaris v. Surgical Consultants, Ltd.*, 100 Wis.2d 387, 388, 302 N.W.2d 76, 78 (Ct. App. 1981), in which the employer's practice was limited to surgery and most of its patients were referred by other physicians. We held that by providing the physician-employee "with referral contacts, and by aiding development of his reputation among area physicians, Surgical Consultants acquired a protectable right . . . ."

—to take away the Center's business, unless his promise not to compete is unenforceable for other reasons.

### 2. *Penal Nature Of Liquidated Damages Clause*

The covenant not to compete requires that Christensen pay Fields $2,000 in liquidated damages for each day of its violation. The trial court refused to enforce the liquidated damages clause because it is penal. A liquidated damages clause is penal, and therefore unenforceable, if the stipulated damages are grossly in excess of the actual damages. *McConnell v. L. C. L. Transit Co.,* 42 Wis.2d 429, 438, 167 N.W.2d 226, 230 (1969), quoting *Sheffield-King Milling Co. v. Jacobs,* 170 Wis. 389, 398, 175 N.W. 796, 800 (1920).

The trial court held that the clause is penal because the Center assumed in computing the $2,000 that it would lose all its income to Christensen's competition.[3] The Center scheduled the same number of abortions after Christensen resigned as before, about 400 each month. Fields offered no evidence of actual damages suffered by the Center after Christensen's breach.

The factual basis for the finding that the clause is penal is not contrary to the great weight and clear preponderance of the evidence and will not be set aside. *Cogswell v. Robertshaw Controls Co.,* 87 Wis.2d 243, 249, 274 N.W.2d 647, 650 (1979). Whether the liquidated damages clause is penal on the basis of the established facts is a conclusion of law. *McConnell,* 42 Wis.2d at 438, 167 N.W.2d at 230.

---

[3] Jeffrey Grossman, the principal organizer of Fields, testified that the $2,000 was based on Christensen's completion of about twenty abortions per day at $200 each, less fifty percent for overhead.

Fields contends that its actual damages are irrelevant to whether the clause is penal because a liquidated damages clause is an attempt to predetermine future damages "to the extent those damages are reasonably contemplated by the parties at the time of the contract." *Martinson v. Brooks Equipment Leasing, Inc.*, 36 Wis.2d 209, 222, 152 N.W.2d 849, 856, 154 N.W.2d 353 (1967). Here, however, the trial court considered the complete absence of harm from Christensen's breach, rather than merely the amount of Fields' damages.

The total absence of actual harm resulting from a breach may be considered in determining whether liquidated damages are penal rather than compensatory. A defendant against whom a liquidated damages clause is sought to be enforced "should be allowed to show that there has in fact been no injury at all." *Corbin on Contracts* sec. 1063 at 368 (1964). Even if the parties honestly but mistakenly believe that a breach will cause harm, a liquidated damages clause is unenforceable when no harm results. *Restatement of Contracts* sec. 339, comment *e* at 553–54 (1932).[4]

### 3. *Liquidated Damages Clause Not A Restraint*

Christensen contends that because the covenant contains a liquidated damages clause which is penal and therefore an unreasonable restraint, the entire covenant is unenforceable. Section 103.465, Stats., voids a restrictive covenant which imposes an unreasonable restraint, even

---

[4] *Accord, Restatement (Second) of Contracts* sec. 339(2) at 158 (Tent. Draft No. 12, March 1, 1977): "An amount of money fixed as damages is liquidated damages and not a penalty if it is reasonable in the light of the anticipated or actual harm caused by the breach and the difficulties of proof of loss." Comment *b* states, "If . . . it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable." *Id.* at 160.

as to so much of the covenant as would be a reasonable restraint. We conclude that a liquidated damages clause is not a restraint against competition and that the unenforceability of the clause does not affect the balance of the covenant.

The restraints prohibited by sec. 103.465, Stats., and this state's case law consist of occupational restrictions. Section 103.465 refers to restrictions in a covenant not to compete.

[Section 103.465] does not change the prior law of what constitute unreasonable restraints because the section only requires the restrictions as to time and place to be reasonably necessary for the protection of the employer. If such a contract is void for *other* reasons, such as public policy, or sec. 133.01(1), Stats., or creates an undue hardship upon the employee, a court of equity will not enforce it. *Lakeside Oil Co.,* 8 Wis.2d at 162, 98 N.W.2d at 419 (emphasis added).

*Behnke,* 70 Wis.2d at 821, 235 N.W.2d at 692, in discussing the common law of this state applicable to employment contracts, approved *Restatement of Contracts* sec. 513 at 987 (1932) : "A bargain is in restraint of trade when its performance would . . . restrict a promisor in the exercise of a gainful occupation."

A liquidated damages clause in a covenant not to compete pertains to the consequences flowing from prohibited competition and is not itself an occupational restriction. The existence of a liquidated damages clause may induce performance of the covenant, but it is no more an occupational restriction than is the employee's potential liability for damages absent such a clause.

Because a profit-sharing or pension plan is part of the employment contract, a provision that the employee forfeits his interest in the plan for competing with his employer is a restraint against competition to which sec. 103.465, Stats., is applicable. *Estate of Schroeder,* 53 Wis.2d 59, 191 N.W.2d 860 (1971) ; *Holsen v. Marshall &*

*Ilsley Bank,* 52 Wis.2d 281, 190 N.W.2d 189 (1971).[5] These cases do not suggest, however, that the forfeiture is itself a restraint but hold only that the implicit restriction against competition which causes a forfeiture is a restraint. Thus, *Hunter of Wisconsin, Inc.,* 101 Wis.2d at 466–67, 304 N.W.2d at 755, states that the forfeiture provision described in *Holsen, supra,* violated sec. 103.465, Stats., "because it contained neither area nor time limitations."[6]

The unenforceability of a liquidated damages clause does not affect the damages recoverable for breach of the contract in which it appears. *Restatement of Contracts* sec. 339(1) at 552 (1932); *Williston on Contracts* sec. 769 at 639 (3d ed. 1961).

Accordingly, we hold that a covenant by an employee not to compete is not automatically voided by the presence of an unreasonable provision for liquidated damages.

### 4. *Area And Time Restrictions Reasonable*

Whether specific restraints as to area and time are reasonably necessary to protect the employer, as required

---

[5] *See also Zimmermann v. Brennan,* 78 Wis.2d 510, 514, 254 N.W.2d 719, 721 (1977) (forfeiture provision in profit sharing plan if employee engages in competitive business is an agreement in restraint of trade), and dictum in *Rosploch v. Alumatic Corp. of America,* 77 Wis.2d 76, 79–80 n. 1, 251 N.W.2d 838, 840–41 (1977) (noncompetition forfeiture clause in pension or profit sharing plans is contract in restraint of trade, subject to sec. 103.465, Stats.).

[6] Christensen relies on *Associated Surgeons, P.A. v. Watwood,* 295 Ala. 229, 326 So.2d 721 (1976), in which an employment contract provided that if the physician-employee practiced medicine after termination, the employee would pay a lump sum as liquidated damages. The Alabama Supreme Court held that the damages provision itself was a restraint on the exercise of a lawful profession and was therefore void under the statutes of that state. We reject that view.

by sec. 103.465, Stats., is a question of law to be resolved on the basis of the facts. *Geocaris v. Surgical Consultants, Ltd.*, 100 Wis.2d 387, 388, 302 N.W.2d 76, 77–78 (Ct. App. 1981).

The fifty-mile restriction covers an area from which sixty-two percent of the Center's business originated. The restriction bears a reasonable relation to the Center's business and is not overbroad. The restriction not only leaves thirty-eight percent of the Center's business open to competition, but allows Christensen to divert part of the protected business by establishing a clinic outside the area and treating patients who reside within it.

Christensen argues that as the restraint is not limited to the Center's actual patients and referrals within the fifty-mile area, the entire covenant is void. The absence of such a limitation is immaterial because few abortion patients are "repeats" and the monitoring of Christensen's compliance with it would be nearly impossible. Reasonableness does not require that a covenant not to compete be precise in appearance but unworkable and illusory in fact.

Flat rules of reasonableness do not exist for restrictive covenants, *Hunter of Wisconsin, Inc.*, 101 Wis.2d at 468, 304 N.W.2d at 756, but two-year limitations have previously been upheld and are therefore not unreasonable per se. *Chuck Wagon Catering, Inc., supra; Lakeside Oil Co., supra; Eureka Laundry Co. v. Long,* 146 Wis. 205, 131 N.W. 412 (1911). "Reasonableness in this respect depends upon the period of time required to obliterate in the minds of the plaintiff's customers the identification formed during the period of the defendant's employment." *Lakeside Oil Co.,* 8 Wis.2d at 164–65, 98 N.W.2d at 420. Given the medical community's close identification of Christensen with the Center, the two-year restriction is reasonable.

### 5. *Restrictions Not Unduly Harsh Or Oppressive*

The covenant not to compete in an employment contract is void at common law if it creates undue hardship upon the employee or is contrary to public policy. *Lakeside Oil Co.*, 8 Wis.2d at 162, 98 N.W.2d at 419. Neither common law principle voids Christensen's promise not to compete.

The covenant, according to its express·terms, does not affect Christensen's right to practice obstetrics and gynecology anywhere and anytime. Because the Center's business is limited to first trimester abortions, the trial court did not enjoin Christensen from performing second trimester abortions.[7] He may establish a clinic immediately outside the fifty-mile radius and there perform first trimester abortions for patients residing in the fifty-mile radius.

Christensen contends that he has been severely limited in his practice because he cannot, within the limited radius and time period, hold himself out as performing first trimester abortions or as specializing in abortions generally, whether first or second trimester. If he were permitted to hold himself out as performing abortions, generally, the potential is obvious for violation of the restrictions against performance of first trimester abortions. The court orders complained of do not exceed the terms of the contractual prohibitions against competition which Christensen voluntarily assumed.

Christensen asserts that this particular covenant is against public policy because his clinic's fees are less than those charged by his employer at the Center. Price differentials usually are of the essence of competition, but a

---

[7] The trial court defined the first trimester as the first twelve weeks from the last menstrual period.

lawful covenant not to compete in the practice of medicine is not against public policy. *Oudenhoven v. Nishioka,* 52 Wis.2d 503, 190 N.W.2d 920 (1971). Were we to void Christensen's promise not to compete, nothing would prevent him from subsequently increasing his prices. The record is unconvincing that Christensen's motivations are wholly charitable.[8]

### 6. *Accounting Properly Denied For Post-Employment Abortions*

Part of the relief sought by Fields is that Christensen account for and pay to Fields all funds received by him for abortions performed during and after his employment. The trial court denied such relief as to abortions Christensen performed after termination of the employment contract.

Fields argues it has a right to know how much Christensen collected on prohibited abortions so that it can compute its damages. That was not the theory of Fields' complaint, which demanded simply that Christensen pay over everything he collected. Fields has made no attempt to prove its actual damages. We will not disturb the trial court's refusal to grant relief sought by Fields in this respect.

---

[8] When Christensen was hired by the Center he had an annual guaranteed salary of $140,000 and the option to acquire a ten percent interest in the building in which the Center is housed. By September 1979 his demands for a new contract, the denial of which culminated in his resignation, included: a fee arrangement which would result in an annual salary in excess of $300,000; permission to do second trimester abortions which would increase that income substantially; permission to conduct his own medical practice; a percentage of the fees of any other physician who might be employed at the Center; and a fifty percent interest in the building.

### 7. Defamation Claim

The first inquiry in evaluating a claim for defamation is whether the communication complained of is capable of a defamatory meaning. *Schaefer v. State Bar*, 77 Wis.2d 120, 122, 252 N.W.2d 343, 345 (1977); *Lathan v. Journal Co.*, 30 Wis.2d 146, 151, 140 N.W.2d 417, 420 (1966); *Prahl v. Brosamle*, 98 Wis.2d 130, 139, 295 N.W.2d 768, 775 (Ct. App. 1980). This state has adopted the definition of "defamatory" currently stated in *Restatement (Second) of Torts* sec. 559 at 156 (1977): "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *See Lathan*, 30 Wis.2d at 153, 140 N.W.2d at 421. A defamatory statement is one reasonably capable of conveying a defamatory meaning to the ordinary mind. *Meier v. Meurer*, 8 Wis.2d 24, 29, 98 N.W.2d 411, 414 (1959).

Whether a communication is capable of a defamatory meaning is a matter of law for the court. *Starobin v. Northridge Lakes Development Co.*, 94 Wis.2d 1, 10, 287 N.W.2d 747, 751 (1980); *Prahl*, 98 Wis.2d at 139, 295 N.W.2d at 775, quoting *Lathan*, 30 Wis.2d at 153, 140 N.W.2d at 421. If a defamatory meaning can be found from the communication's language, the court must consider, on the basis of the facts, whether a defense exists. *Lathan*, 30 Wis.2d at 151, 140 N.W.2d at 420; *Prahl*, 98 Wis.2d at 139, 275 N.W.2d at 775. Substantial truth of the communication is one such defense. *DiMiceli v. Klieger*, 58 Wis.2d 359, 363, 206 N.W.2d 184, 187 (1973); *Lathan*, 30 Wis.2d at 158, 140 N.W.2d at 423; *Prahl*, 98 Wis.2d at 141, 275 N.W.2d at 776.

Fields' defamation claim is principally based on Christensen's resignation letter. Christensen circulated the let-

ter to the Center's staff and made similar statements to other physicians.

Fields was organized as a nonprofit foundation and received tax-exempt status as such from Internal Revenue Service. Christensen's letter, however, states that "the charitable aspects compared to the commercial aspects of the operation are like the flea in the dog," that the possibility that he as a licensed physician "might be considered illegally employed by a for-profit corporation" concerned him and that the "possibility that this corporation might be seen as masquerading as a charitable enterprise simply to obtain preferential tax treatment" made that concern overwhelming. The letter continues that Christensen could not remain an employee of "an entity which was in effect making use of my medical skills in a business for profit."

The trial court aptly characterized Christensen's letter as charging that Fields conducted a sham nonprofit operation. Given the sensitive nature of Fields' business, its dependence on the confidence of the medical community and social agencies and to some extent on public and private donations, the trial court concluded that Christensen's statements were defamatory. We agree.

Words which charge an individual or a corporation with dishonorable, unethical or unprofessional conduct in a trade, business or profession are capable of a defamatory meaning. *Converters Equipment Corp. v. Condes Corp.*, 80 Wis.2d 257, 263, 258 N.W.2d 712, 715 (1977). A bogus nonprofit foundation is despicable. To charge an ostensibly legitimate foundation with a sham operation inevitably causes others to shun it. The charge is defamatory. *Restatement (Second) of Torts* sec. 559 at 156 (1977).

That Christensen's statements were phrased as his opinion does not make them nondefamatory. *Converters Equipment Corp.*, 80 Wis.2d at 263-64, 258 N.W.2d at

715. "One may be libeled by implication and innuendo quite as easily as by direct affirmation." 80 Wis.2d at 264, 258 N.W.2d at 715, quoting *Frinzi v. Hanson,* 30 Wis.2d 271, 277, 140 N.W.2d 259, 262 (1966). Third persons would accept as authoritative defamatory statements in opinion form by the Center's medical director describing Fields' operation.

Having concluded that Christensen defamed the foundation, the trial court found that his charge that Fields conducted a sham nonprofit operation was substantially true because Grossman and others received substantial sums from the Center's revenues, notwithstanding Fields' tax-exempt status. Whether a defamatory statement is substantially true is a question of fact. Findings of fact by the trial court will not be set aside unless they are against the great weight and clear preponderance of the evidence. *Cogswell,* 87 Wis.2d at 249, 274 N.W.2d at 650. The trial court's finding that Christensen's defamatory statements were substantially true is not against the great weight and clear preponderance of the evidence.

Grossman and a James Templeton were the officers and directors of the foundation when Grossman obtained its tax-exempt status in 1977. The trial court found that Grossman failed to disclose to Internal Revenue Service that he and Templeton owned the stock of Sierra Financial Services which did the Center's bookkeeping for forty percent of its gross receipts and of Sierra Services which performed the Center's laboratory work, and that they were partners doing business as Regent Street Associates which leased the building to the Center. Grossman originally owned eighty percent of these three ancillary organizations and acquired Templeton's twenty percent in 1979.[9] Each organization received all its income from

---

[9] The trial court found that after Christensen resigned, Grossman donated his stock in the two Sierra corporations to the foundation. Whatever the effect of that gift upon the operations of Fields after Christensen resigned, it does not affect the merits of the claim for defamation based on Christensen's resignation letter.

Fields. Between 1977 and 1980 Grossman's equities in the Sierra companies increased by $98,927. Grossman had consulting arrangements with the foundation and the two Sierra companies, by which he received $64,966 in 1977, $76,120 in 1978 and $48,500 in 1979. He received travel and miscellaneous expenses from the foundation and the ancillary organizations totaling $67,991 in the same period. He had the use of a home in Madison purchased by Regent Street Associates which paid all his household expenses, including furniture, decorating, insurance, and utilities.

Fields argues that the trial court erroneously assumed that Grossman did not inform Internal Revenue Service about his consulting fees and traveling and living expenses and the Center's lease of space from the partnership. Fields' tax returns disclosed the services provided by the ancillary organizations, Grossman's interest in those organizations and Fields' payments to them, but did not disclose his consulting arrangement with Fields. The Sierra corporations' tax returns disclosed their receipts and expenses but not Grossman's consulting arrangements with those organizations or the expenses they paid to him. The partnership returns did not disclose Grossman's use of the Madison home. The trial court could reasonably infer that Internal Revenue Service was not informed of the extent of Grossman's involvement in the various enterprises. An appellate court must accept reasonable inferences drawn by the trier of fact from credible evidence. *Cogswell*, 87 Wis.2d at 250, 274 N.W.2d at 650.

Grossman enmeshed himself in a maze of profitable enterprises, each of which, with Grossman as its sole shareholder or owner, received its only income from his foundation. That Fields remains tax exempt as a nonprofit foundation and has made charitable and educational contributions does not detract from the overall truth of Christensen's charge that Fields conducted a

sham nonprofit operation. "It is not necessary to prove the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance." *Lathan,* 30 Wis.2d at 158, 140 N.W.2d at 423, quoting *Restatement of Torts* sec. 582 at 218 (1938).

Because Christensen established a defense of truth to Fields' defamation claim, the trial court properly dismissed that claim.

### 8. *Clean Hands Doctrine*

An injunction is equitable relief. *McKinnon v. Benedict,* 38 Wis.2d 607, 616, 157 N.W.2d 665, 669 (1968). "The principle that a plaintiff who asks affirmative relief must have clean hands . . . is both ancient and universally accepted." *Huntzicker v. Crocker,* 135 Wis. 38, 41, 115 N.W. 340, 341–42 (1908). The trial court held that the clean hands doctrine did not affect Fields' right to injunctive relief because Fields did not breach the employment contract or cause the dispute between the parties, citing *David Adler & Sons Co. v. Maglio,* 200 Wis. 153, 228 N.W. 123 (1929). Christensen contends on appeal that the conduct of Grossman, as an officer and director of Fields, was sufficiently related to the controversy to bring the clean hands doctrine into play.

Christensen finds such related conduct in Grossman's misrepresentations to Christensen, patients, law enforcement officials and a judge that he was a medical doctor and misrepresentations to Internal Revenue Service regarding the Fields operations.

The trial court found that Grossman did not complete medical school, but held himself out as a physician on numerous occasions and even participated in the examination of patients. Although he learned in February 1979 that Grossman was not a medical doctor, Christensen

never raised that matter until he resigned ten months later. After discovering Grossman's lucrative financial relationships with the Center early in 1979, Christensen continued throughout the year to attempt negotiation of a new employment contract. Christensen does not dispute these findings.

Because Grossman's conduct had little, if any, effect on the true controversy between the parties, the clean hands doctrine is inapplicable. As said in *Huntzicker*, 135 Wis. at 41–42, 115 N.W. at 342:

Equity does not demand that its suitors shall have led blameless and pure lives. If it did, the chancellor's court would be little frequented. The general principle simply is that he who has been guilty of substantial misconduct "in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties and arising out of the transaction," shall not be afforded relief when he comes into court as an actor seeking to set the judicial machinery in motion.

*By the Court.*—Orders affirmed. No costs to either party.