**In the Matter of CENTRAL WATCH, INC., Debtor.**

**CENTRAL CONTROL ALARM CORP., Plaintiff,**

v.

**Gary T. BLACK, individually and d/b/a Security Consultants, Defendant.**

**Bankruptcy No. 80–02639.**
**Adv. No. 81–1173.**

United States Bankruptcy Court, E. D. Wisconsin.

July 28, 1982.

Thomas G. Ryan, Minahan & Peterson, Milwaukee, Wis., for plaintiff.

Jeffrey S. Schuster, Stupar, Gollin & Schuster, Milwaukee, Wis., for defendant.

## MEMORANDUM DECISION

C. N. CLEVERT, Bankruptcy Judge.

### I. INTRODUCTION

The issues before the court involved the rights of the reorganized Chapter 11 debtor, Central Control Alarm Corp., (Central) and Gary Black, its former president, under a prepetition employment contract which was neither assumed nor rejected in the Chapter 11 proceeding. In its amended complaint, filed on November 5, 1981, Central essentially sought to enforce a restrictive covenant provision in the employment contract. Gary Black on the other hand contended that the restrictive covenant should not be enforced because it was an unreasonable restraint of employment which was not needed to protect Central's legitimate business interests and that it is contrary to § 103.465, Wis.Stat. Black also argued that enforcement of the covenant would be inequitable because of lack of mutuality in the employment contract and because of an alleged breach of a hold harmless provision in the contract.

The matter was tried by the court, and the parties filed proposed findings of fact and conclusions of law as well as briefs on the various issues.

\* \* \* \* \* \*

The facts may be summarized as follows:

Central Control Alarm Corporation is engaged in providing protective security systems and related monitoring services in essentially a five county area of Southeastern Wisconsin, including Milwaukee, Ozaukee, Washington, Waukesha and Racine. The defendant, Gary Black, co-founded the company in 1975 under the name Central Watch, Inc.; was a director and president of the corporation from its inception through November of 1980; was one of its principal shareholders until August 28, 1980; and served as its president until November 15, 1980.

Black's responsibilities included soliciting, negotiating and executing customer contracts. Consequently, he had extensive contact with Central's actual and potential customers and was cognizant of the terms and lengths of their contracts.

From time to time Central experienced financial problems which resulted in Black and all other shareholders selling their shares in the corporation to new investors and Central securing loans to sustain its operations. It was in that context that Black and Central entered an employment contract continuing Black as president of the corporation at a first year salary of $30,000.

Among the provisions of the contract were a restrictive covenant and a hold harmless covenant which provided, in pertinent part:

*Restrictive Covenant.* Black agrees, that because of his knowledge and experience in the detailed operation of alarm systems, related activities, and development of customers for the Company that he will not without the written consent of the Company for a period of 2 years after termination of his employment, for whatever reason, engage directly or indirectly in any capacity, whatsoever, including but not limited to, as an investor, owner, employee, agent, representative or consultant in competition with then business activities of the Company in the following Counties located in the State of Wisconsin, to-wit: Milwaukee, Ozaukee, Racine, Washington and Waukesha. In addition to any other rights or remedies available to the Company for breach of the terms of this agreement, the Company shall be entitled to obtain enforcement of this restriction by Court injunction.

\* \* \* \* \* \*

Hold *Harmless.* Company and its Board of Directors agree jointly and severally in the event of Black's termination of employment, to hold Black harmless from and against any and all claims, actions, liabilities, causes and the like arising out of a good faith performance as an officer and director of Central Watch, Inc., and Wisconsin Central Watch, Inc.

On October 24, 1980, approximately two months later, Central filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. And less than a month afterward Central terminated Black's employment.

Within a month, and without Central's consent, Black, along with his mother and Mark Jones, began Security Consultants, a firm engaged in providing security systems and monitoring services throughout the Milwaukee metropolitan area. Black has since served as president and treasurer of Security Consultants, Inc.;—which was incorporated in April of 1981—and has performed

essentially the same duties that he performed for Central.

On August 28, 1981, Central's reorganization plan was confirmed without it having taken any steps to assume or reject Black's employment contract. Two months afterward, Central filed the complaint in this case (under its new name).

Although the parties have framed the issues in their pleadings as primarily ones arising from alleged breaches of the employment contract, it was not until the end of the trial that they raised the executory contract issues—i.e., whether or not the contract in question is an executory contract, within the meaning of 11 U.S.C. § 365, whether the debtor has assumed or rejected the contract, and whether confirmation of the Chapter 11 plan, absent assumption or rejection, may bar this court from determining the breach of contract issue.

## II. EFFECTS OF INACTION REGARDING EMPLOYMENT CONTRACT

■ It is clear that when Black was terminated, he and Central still had obligations under the employment contract. Black was to refrain from competition with Central and Central was to hold Black harmless for liabilities he incurred in the good faith performance of his duties as an officer of the corporation. Thus, as of November 15, 1980, the employment contract was an executory contract "under which the obligation of both the bankrupt and the other party to the contract . . . [was] so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." [1]

However, due to the confirmation of Central's Chapter 11 plan it must be determined whether the contract is still enforceable. Although 11 U.S.C. §§ 365(a) and

---

1. Countryman, *Executory Contracts in Bankruptcy: Part I* 57 Minn.L.Rev. 439, 460 (1973); *Report of the Commission of the Bankruptcy Laws of the United States*, H.R.Doc.No.137, 93d Cong., 1st Sess. (1973), Pt. II at 155 reprinted in App. Vol. 2 *Collier on Bankruptcy* (15th ed.)

(d)(2)[2] provide that a debtor may, with the court's approval, assume or reject an executory contract at any time prior to confirmation, the Code does not specifically address the effects of inaction. Nevertheless, courts have generally held that executory contracts continue in force until expressly assumed or rejected.

In *In re Shopper's Paradise, Inc.*,[3] the Chapter 11 debtor in possession filed a post-petition claim against Masters, Inc. for rent under a shopping center lease. Prior to the Chapter 11, Shoppers had commenced a summary proceeding seeking removal of Masters, but Masters contested the eviction proceedings and rent was kept in escrow. One of the issues was whether or not the lease was terminated at the time of the filing. Other issues were whether or not the executory contract should have been assumed and whether "Shoppers' adversary proceeding seeking to recover postpetition rentals . . . [was] tantamount to an assumption of the lease."[4] The court held that:

Until assumed or rejected, an executory contract or unexpired lease remains in force and if neither assumed nor rejected, passes with other property of the debtor to the reorganized corporation. *Consolidated Gas Electric Light & Power Co. v. United Railways & Electric Co.*, 85 F.2d 799, 805 (4th Cir. 1936) cert. den. 300 U.S. 663, 57 S.Ct. 493, 81 L.Ed. 871 (1937). See *Smith v. Hill*, 317 F.2d 539 (9th Cir. 1963); *Federal's Inc. v. Edmonton Investment Company*, 404 F.Supp. 68, 71 (E.D. Mich.1975) aff'd 555 F.2d 577 (6th Cir. 1977); 8 *Collier on Bankruptcy* ¶ 3.15(6) at 204 (14th Ed. 1978).

Thus, although Code § 365(a) expressly requires court approval before a debtor-in-possession may assume or reject a contract or an unexpired lease, (and it is not disputed that Shoppers never obtained court approval to assume the lease), it does not follow that Masters is relieved of its obligation to pay rent. Even where court approval was not obtained the debtor-in-possession may be deemed to have adopted the contract or lease where it received benefits and when the issue presented is whether or not such benefits should be entitled to an administration expense claim. See *In re Unishops*, 553 F.2d 305 (2 Cir. 1977); *In re W. T. Grant Co.*, 474 F.Supp. 788 (S.D.N.Y.1979) aff'd 620 F.2d 319 (2 Cir. 1980).[5]

Judge Schwartzberg's ruling in the *Shoppers Paradise* case was very persuasive and accordingly it is held that Black's employment contract remains enforceable.

## III. RESTRICTIVE COVENANT

It was uncontroverted that Black's employment by Security Consultants violated the terms of his employment contract. Therefore, the issues which must be decided with respect to the employment contract

**2.** § 365. Executory contracts and unexpired leases.

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(d)(2) In a case under chapter 9, 11, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of the debtor at any time before the confirmation of a plan, but the court, on request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

§ 1107. Rights, powers, and duties of debtor in possession.

(a) Subject to any limitations on a trustee under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

(b) Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

**3.** 8 B.R. 271, 7 B.C.D. (CRR) 69, 3 Collier Bankr.Cas.2d (MB) 484 (Bkrtcy.S.D.N.Y.1980).

**4.** 8 B.R. at 278.

**5.** 8 B.R. at 278–279.

are whether (A) the covenant is enforceable under Wisconsin law, (B) whether Central breached the contract's hold harmless covenant so as to preclude the enforcement of the restrictive covenant and (C) whether equitable grounds exists to bar enforcement of the restrictive covenant.

\* \* \* \* \* \*

A. Enforceability under Wisconsin Law

Section 103.465, Wis.Stat. addresses the subject of restrictive covenants and provides:

> A covenant by an assistant, servant or agent not to compete with his employer or principal during the term of the employment or agency, or thereafter, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any such restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant or performance as would be a reasonable restraint.

In the case of *Fields Foundation, Ltd. v. Christensen*,[6] the Wisconsin Court of Appeals discussed § 103.465 and the common law standards for determining the enforceability of restrictive covenants.

> The statute and the common law require this court to make five distinct inquiries in evaluating the enforceability of a covenant not to compete. The covenant must (1) be necessary for the protection of the employer; (2) provide a reasonable time restriction; (3) provide a reasonable territorial limit; (4) not be harsh or oppressive as to the employee; and (5) not be contrary to public policy. *See, Chuck Wagon Catering, Inc. v. Raduege*, 88 Wis.2d 740, 751, 277 N.W.2d 787, 792 (1979).[7]

Therefore, this court has applied those standards to the facts in this case, and has kept in mind that "the ultimate issue— the reasonableness of the agreements . . .— turns upon the totality of the facts and circumstances surrounding them . . ." [8] and that the burden of proving reasonableness rests on the employer.[9]

(1) *Protection of the employer.* The circumstances attendant to the employment contract support the conclusion that the terms of the restrictive covenant were ". . . reasonably necessary for the protection of the legitimate interests" [10] of Central. The evidence presented at the trial showed that Black, as president, director, and principal shareholder of Central was critical to the operation and existence of the company since its formation in 1975. Black co-founded Central and was not unlike a parent who raised a child from infancy. Indeed, Black credited himself with building up the company from two to sixty employees, providing security services on a statewide and nationwide basis. Black personally solicited customers, advised them of their security needs, negotiated and finalized customer contracts, serviced customers and generally exercised control over customer files. But more importantly, Black personified Central. He had an intimate knowledge of every phase of Central's business operations and expertise in the security field which was unequalled by other members of Central's board of directors at the time the employment contract was entered. When it was also considered that Central was on the brink of bankruptcy when the employment contract was signed and could ill afford potentially disastrous competition from Black or others privy to his "inside information," the need for the restrictive covenant became obvious. And so, it was vitally important to Central that it have some

---

6. 103 Wis.2d 465, 309 N.W.2d 125 (Wis.Ct.App. 1981).

7. *Fields*, 103 Wis.2d at 470–471.

8. *Rollins Burdick Hunter of Wisconsin, Inc. v. Hamilton*, 101 Wis.2d 460, 471, 304 N.W.2d 752 (Wis.1981).

9. *Geocaris v. Surgical Consultants, Ltd.*, 100 Wis.2d 387, 388, 302 N.W.2d 76 (Wis.Ct.App. 1981).

10. *Lakeside Oil v. Slutsky*, 8 Wis.2d 157, 162, 98 N.W.2d 415 (1959).

means of protecting itself from a potentially unfair sales advantage in a highly competitive market.[11]

In *Lakeside Oil v. Slutsky*, the court looked at whether or not the employer had a legitimate need for protection against a former employer by examining the employee's relationship with customers and his knowledge of the employers business before going on to enforce a two year restrictive covenant.[12] In that case the employee's principal duties were servicing customers and soliciting customers on the basis of his personal rapport and trust. The employee also had access to his employer's sales and delivery records.

The court said:

Here Slutsky was hired as a salesman to develop customers for the plaintiff. The mere opportunity of Slutsky to become acquainted with the customers would not determine a reasonable necessity, but Slutsky's personal relationship with the customers, whom he obtained by his own personality and salesmanship and whom, in most cases, the plaintiff did not know personally, amounted to such control or influence that Slutsky would be able to take such customers away from the plaintiff. Slutsky not only developed the customers but he also serviced them. The plaintiff's business is highly competitive; there is very little or no variation in price or difference in the products sold. Sales made by Slutsky were due not to price or the fact that they involved the plaintiff's product but to the customers' confidence in Slutsky or his personal relationship with the customers. To his customers Slutsky was identified with the plaintiff's business. This was due in part because he was the main contact with the customers; the sales took place primarily at the customer's home or business. He was no mere order taker but a salesman with some authority and standing. Under such circumstances the plaintiff has a great need for protection from the competition of his former employer.[13]

In another recent case, *Chuck Wagon Catering, Inc. v. Raduege*,[14] the defendant, Raduege, leased a lunch route from Chuck Wagon for the purpose of selling food and beverages to industrial customers. Included in the lease agreement was a covenant that Raduege would not compete in the catering business on that route for a period of one year. Raduege eventually terminated his lease without notice, yet he continued to service the same route in competition with Chuck Wagon. When Chuck Wagon realized that its route customers were loyal to Raduege so as to make it impossible to successfully compete, suit was brought to enforce the restrictive covenant. The Wisconsin Supreme Court observed in its decision upholding the enforceability of the covenant that:

The purpose of a covenant restraining an agent from competing with his principal after he leaves his principal's service is to prevent for a time the competitive use of information or contacts gained as a result of that service. [Citation omitted] In many businesses the relationship with customers is the most valuable asset of the enterprise. In recognition of this fact, customer goodwill has been recognized as a property interest in and of itself. Customer goodwill has value to the extent that a customer knows and feels he can rely upon the salesperson he is dealing with.[15]

In the case before this court Black's prior dealings with MoFoCo and Standard Scrap Metal on behalf of Central were unques-

11. The testimony was that there were a total of six security companies which compete with Central in Milwaukee; three of those (including Johnson Controls which later merged with Central) are so called U. L. rated companies, as is Central.

12. The contract was terminable by either party upon ten days notice and prohibited the employee from directly or indirectly engaging in the gasoline and petroleum business in Milwaukee County for two (2) years.

13. 8 Wis.2d at 163–164, 98 N.W.2d 415.

14. *Chuck Wagon Catering, Inc. v. Raduege*, 88 Wis.2d 740, 277 N.W.2d 787 (Wis.1979).

15. 88 Wis.2d at 751–752, 277 N.W.2d 787.

tionably the initial basis for those companies' interest in doing business with Security Consultants. Based upon Black's testimony that Security Consultants did not solicit business or advertise and that he was contacted by Central's customers, it was also apparent that customer loyalty contributed to other customers signing contracts with Black and Security Consultants and terminating their contracts with Central.

Although the restrictive covenant under consideration in this case did not purport to arise from the sale of a business, the court could not ignore the fact that Black was a primary stockholder of Central and that he and other Central stockholders sold all of their stock to the parties who now own Central. Hence, the restrictive covenant was also viewed as a means of protecting the new owners goodwill. As professor Harlan M. Blake has written: [16]

> A transfer of goodwill cannot be effectively accomplished without an enforceable agreement by the transferor not to act so unreasonably to diminish the value of that which he is selling. The same is true in regard to any other property interest of which exclusive use is part of the value. . . . The essential purpose of the post-employment restraint is quite different, however. Its objective is not to prevent the competitive use of the unique personal qualities of the employee—either during or after the employment—but to prevent competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment. Unlike a restraint accompanying a sale of goodwill, an employee restraint is not necessary for the employer to get the full value of the thing being acquired—in this case, the employee's current services. The promise

not to act in certain ways after terminating employment is something additional which the employer may or may not feel to be important and worth bargaining and paying for, depending on the circumstances. A sale of goodwill implies some obligation to deliver the thing sold by refraining from competition, just as an employment contract implies some obligation not to impair the value of services rendered by competitive activity during the period of employment.

(2) *Reasonable time restriction.* Over a period spanning 70 years, Wisconsin courts have enforced restrictive covenants designed to protect employers' customer contacts.[17] Thus as night follows day, there is no doubt that the 2 year restriction in Black's employment contract was reasonable in duration.

(3) *Reasonable territory.* The five county territorial restriction placed on Black prohibited him from competing with Central in its primary sales and service area. Similar limitations, such as those in the cases cited above have been found reasonable by Wisconsin courts. And so, even though as many as 98 percent of Central's customers were located in Milwaukee County in 1980, Central had a right to protect service customers within the scope of its business activities in areas outside Milwaukee County.[18]

(4) *Reasonable employee impact.* Black, an apparently healthy thirty-one year old high school graduate, had extensive training in the electronics and protective security fields. According to his testimony, Black was experienced in radar and radio repair and had worked for several security firms as an installer, service man, central station clerk, and collections clerk. He even testified that he helped write a service manual for one of his employers.

**16.** Blake, *Employee Agreements Not to Compete*, 73 Harv.L.Rev. 625, 646–647 (1960).

**17.** *Chuck Wagon Inc. v. Raduege*, 88 Wis.2d 740, 277 N.W.2d 787 (Wis.1979); *Lakeside Oil v. Slutsky*, 8 Wis.2d 157, 98 N.W.2d 415 (Wis. 1959); *Eureka Laundry Co. v. Long*, 146 Wis. 205, 131 N.W. 412 (Wis.1911); *Fields Founda-*

*tion, Ltd. v. Christensen*, 103 Wis.2d 465, 309 N.W.2d 125 (Wis.Ct.App.1981).

**18.** In 1980, according to Black's testimony, Central had twelve customers in Waukesha, seven in Ozaukee, four in Racine and three in Washington. *See, Behnke v. Hertz Corp.*, 70 Wis.2d 818, 822, 235 N.W.2d 690 (Wis.1975).

In the absence of testimony that Black could not relocate outside of the five county Milwaukee metropolitan area the court could not conceive how the restrictive covenant could be classified as harsh or oppressive. Black was free to engage in other businesses within the restricted area and was equally free to engage in a competitive business outside the restricted area. Black testified that the security protective field is depression proof and that Security Consultant's business is nationwide. Thus, adherence to the five county restriction would probably result in little more than a minor limitation on his business activities.

(5) *Public policy considerations.* In *Lakeside Oil v. Slutsky*, the court said:

In considering the reasonableness in respect to the interest of the general public there must be weighed the interest of the public in having access to the employee's particular services during the time and in the area restricted with the benefits that accrue to the public from such restrictive covenants in creating others for employment.[19]

After the facts have been weighed in light of *Lakeside v. Slutsky*; after noting the level of competition in the security protection field here in Milwaukee; and after giving due regard for Black's individual circumstances, this court has concluded that enforcement of the restrictive covenant is not contrary to public policy.

... [T]his contract does not create any shortage of employees or of this type of service or stifle competition or create a monopoly. The plaintiff is a small company.... Whether the defendant competes or does not compete with the plaintiff will have no effect on the public generally. The enforcement of this covenant will not create any danger that the defendant will become a public charge.[20]

**B. Breach of Hold Harmless Covenant.**

 Between December of 1977 and November of 1979 Pate Duquaine and Co.

(Pate Duquaine) provided accounting services for Central. When Pate Duquaine was asked to meet with another firm which was attempting to update Central's records in 1980, it insisted that it be paid some of its $14,500.00 balance and that Black personally guarantee the debt. Black complied and guaranteed the debt and Central eventually paid $2,000 toward the balance.

In September of 1980, Pate Duquaine sued Central and Black on the debt and guarantee in the Milwaukee County Circuit Court and secured a judgment which Black satisfied in 1981.[21] Black then filed a claim in this Chapter 11 for reimbursement of the sums paid and Central objected. That objection has yet to be heard.

Nevertheless, Black contended that Central's failure to defend the lawsuit and its objection to his claim constitute breach of the hold harmless covenant. By virtue of Central's breach he argued that he was relieved of his obligation under the restrictive covenant as of the date Pate Duquaine filed suit. Central, on the other hand, argued that Black's argument was fatally defective in at least two respects because (1) it ignored the express language of the hold harmless clause and (2) it erroneously assumed that its objection to Black's claim constituted a breach. (Central's post trial brief page 4)

Central's obligation under the hold harmless clause was not absolute and was dependent upon several preconditions other than Black's termination. First, Black must have incurred the debt in his capacity as an officer or director of Central and, secondly, Black must have acted in good faith when the debt was created. Central, therefore, had a right, based upon the language of the hold harmless clause, to inquire into the facts and circumstances surrounding the debt. For those reasons, the Court has found no basis for Black's argument regarding the hold harmless covenant. Likewise, there was no support for Black's

---

19. 8 Wis.2d at 166–167, 98 N.W.2d 415.

20. Id. 8 Wis.2d at 167, 98 N.W.2d 415.

21. The suit against Central was apparently commenced in violation of 11 U.S.C. § 362(a).

argument that there was no mutuality of obligations under the contract.[22]

## IV. TORTIOUS INTERFERENCE WITH CONTRACT

In its second cause of action, Central sought a judgment for damages against Black for his alleged interference with contracts it had with MoFoCo, Forest Laboratories, Inc., Small Animal Hospital, Inc., Western Beauty Supply, The London Cleaners, The London, Standard Scrap Metal Ltd., WISN, Radio Doctors, and Palermo Frozen Pizza Products.

■ Under Wisconsin Law, which has adopted the principles of the First and Second Restatement of Torts,[23]

> one who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.[24]

Our Court of Appeals underscored those principles in *Gruen Industries v. Biller* wherein it observed:

> To recover for interference with contract under Wisconsin law it is essential that the defendant act intentionally. To have the requisite intent, the defendant must act with a purpose to interfere with the contract. Thus,

[I]f the actor does not have this purpose, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other.

*Augustine v. Anti Defamation League*, 75 Wis.2d 207, 219, 249 N.W.2d 547, 553 (quoting Restatement of Torts § 766, Comment d (1939). To show that a defendant had the requisite intent to interfere, it is necessary to show that he had actual knowledge or sufficient notice of the existence of a contract *Sweeney v. Sterjen*, 271 Wis. 497, 74 N.W.2d 174 (1956); *E. L. Husting Co. v. Coca Cola Co.*, 205 Wis. 356, 237 N.W. 85 (1931).[25]

■ Here there was overwhelming evidence that Black knowingly, maliciously and fraudulently induced[26] MoFoCo, Western Beauty Supply Co., Forest Laboratories, The London, The London Cleaners, WISN, and Radio Doctors to breach their protective service contracts with Central and to enter similar contracts with Security Consultants. The evidence also showed that Black's attempts to sign Palermo to a contract with Security Consultants with knowledge of Central's contract, made it necessary for Central to grant Palermo certain contract concessions. Hence, Black was responsible for the profits lost by those concessions.[27]

By contrast, even though it was shown Black caused the Small Animal Hospital to

---

**22.** If the court should over rule Central's objection and Central then refuses to hold Black harmless, then the contract will have been breached.

**23.** *Gruen Industries Inc. v. Biller*, 608 F.2d 274, (7th Cir. 1979); *Chrysler Corp. v. Lakeshore Commercial Finance Corp.*, 389 F.Supp. 1216, 1221 (1975); *Charolais Breeding Ranches v. FPC Securities*, 90 Wis.2d 97, 106–107, 279 N.W.2d 493 (Wis.1979); *Hartridge v. State Farm Mut. Auto. Ins. Co.*, 86 Wis.2d 1, 9, 271 N.W.2d 598 (Wis.1978); *Pure Milk Products Corp. v. National Farmers Organization*, 64 Wis.2d 241, 257, 219 N.W.2d 564 (1974); *Purtell v. Tehan*, 29 Wis.2d 631, 639, 139 N.W.2d 655, 659 (1966); *Mendelson v. Blatz Brewing Co.*, 9 Wis.2d 487, 101 N.W.2d 805 (1960).

**24.** Restatement (Second) of Torts § 766 (1979).

**25.** 608 F.2d at 282.

**26.** "... [F]raudulent intent is inferred from the fact that the defendant, having knowledge of the existence of plaintiff's contract, proceeded to consummate a deal which destroyed plaintiff's rights under the contract. *Sweeney v. Sterjen*, 271 Wis. 497, 501, 74 N.W.2d 174 (1955). The same inference also supports a finding of malice. *See, Mendelson v. Blatz*, 9 Wis.2d at 493, 101 N.W.2d 805 and Harper, *Interference with Contractual Relations*, 47 Nw.U.L.REV. 873, 876 (1953).

**27.** *Wisconsin Power and Light Co. v. Gerke*, 20 Wis.2d 181, 187, 121 N.W.2d 912 (1963).

terminate its protective service contract, it was not proven that the breach was knowingly induced. And so, Black's actions were not tortious in relation to that contract.

## V. PRIVILEGE

█ The law clearly placed on Black the burden of proving the existence of a privilege to interfere with Central's contracts.[28] However, there was no further need to discuss privilege as Black has failed to present any evidence to demonstrate its existence.

## VI. DAMAGES

█ To support its claim for damages, Central submitted copies of its contracts and copies of Security Consultant's contracts. In addition it offered testimony that it realized a sixty percent gross profit on protective service contracts.

After examining the contracts and considering all other evidence presented during the trial it was not immediately clear when each contract became effective or when each was to expire. For example, the top of the WISN contract plaintiff's stated that the agreement was made and entered on September 29, 1977. Paragraph "C" said the "[a]greement is effective *on the date*

*hereof* and shall continue in effect for a period of 5 years from the first day of the first full month of services provided hereunder ..." and the bottom of the agreement showed that it was signed by Gary Black on May 30, 1978, and by Gerald Robinson for WISN, on October 26, 1977. Both signatures appeared immediately above an acknowledgement that the parties had read and understood the terms of the agreement.

The problem was further complicated by sketchy evidence as to when Central's customers terminated their contacts. Nevertheless, based upon the totality of the circumstances surrounding the agreements it can be reasonably inferred that the five year service period provided for in each contract did not begin until the first full month after the protective equipment was installed and after the last signature was placed on the contract. So in regard to WISN, the beginning service date was June 1, 1978, and the date the contract was to have expired was May 31, 1983.

A similar analysis was done with reference to Security Consultant's contracts, to determine when Central's agreements were terminated. As a result of the foregoing and similar analyses, the court arrived at the schedule of damages set forth below.

| | Contract Expiration Date | Date Terminated | 60% of Contract Balance |
|---|---|---|---|
| WISN | 5/31/83 | 7/04/81 | $231 per mo. x 22 mo. x 60% = $3,049.20 |
| MoFoCo | 6/30/83 | 6/30/81 | $37.25 per mo. x 24 mo. x 60% = $536.40 |
| London Cleaners | 5/31/86 | 12/31/81 [a] | $40 per mo. x 53 mo. x 60% = $1,272 |
| The London | 5/31/85 | 12/31/81 [a] | $42 per mo. x 41 mo. x 60% = $1,033.20 |
| Forest Laboratories | 6/31/83 | 9/30/81 [b] | $33 per mo. x 21 mo. x 60% = $415 |
| | 7/31/83 | 9/30/81 [b] | $33 per mo. x 22 mo. x 60% = $435.60 |
| Western Beauty Supply | 8/31/83 | 9/30/81 | $35 per mo. x 23 mo. x 60% = $483 |
| Standard Scrap | 4/30/86 | 12/31/81 [b] | $25 per mo. x 52 mo. x 60% = $180 |
| Palermo | | | $25 per mo. x ? mo. x 60% [c] = $15 |
| Radio Doctors | 12/31/82 | 12/31/81 | $79 per mo. x 12 mo. x 60% = $568.50 |
| | | TOTAL: | $8,588.20 |

[a] This date is based upon the final pretrial report which states that this customer was under contract with Security as of the date of the report.

[b] This date was determined by the latest date set forth in the contract.

[c] The dates for the original Palermo contract were not put into evidence therefore ascertainable damages are limited to gross profits for one month.

28. *Chrysler Corporation v. Lakeshore Commercial Finance Corp.*, 389 F.Supp. 1221–1223. *See generally*, Restatement (Second) of Torts § 768 (1979).

But, even though Central established a claim for damages, it cannot receive a damage award in this case. The court took judicial notice that after this case was tried, Gary Black filed a Chapter 7 petition in this court.[29] Therefore, any further determination of Central's damage claim must be made in accordance with the procedural and substantive law governing Chapter 7 cases.

## VII. CONCLUSION

Based on the foregoing, which stands for the court's findings of fact and conclusions of law in accordance with Rule 752 of the Federal Rules of Bankruptcy Procedure, Central is entitled to an injunction against Gary Black as requested in its amended complaint. Plaintiff is directed to submit a proposed judgment forthwith.

---

**29.** In a telephonic conference on July 23, 1982, counsel for both parties advised the court that they consented to the court taking judicial notice of Black's bankruptcy.