**NALCO CHEMICAL COMPANY, Plaintiff,**

v.

**HYDRO TECHNOLOGIES, INC., Daniel H. Girmscheid and Thomas S. Broge, Defendants.**

**No. 92–C–0412.**

United States District Court, E.D. Wisconsin.

May 7, 1992.

Piette & Jacobson, S.C. by Ronald L. Piette and William J. Richards, Milwaukee, Wis., Stephen N. Landsman, Nalco Chemical Corporate Counsel, Naperville, Ill., for plaintiff.

Quarles & Brady by John A. Rothstein, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

MYRON L. GORDON, Senior District Judge.

On April 16, 1992, the plaintiff, Nalco Chemical Co., commenced this action against the defendants Hydro Technologies, Inc., Daniel Girmscheid, and Thomas Broge. Nalco Chemical is a Delaware corporation engaged in, among other things, the business of water treatment. Hydro Technologies, a Wisconsin corporation, is also engaged in the business of water treatment. Defendants Daniel Girmscheid and Thomas Broge are former employees of Nalco Chemical; they are presently employees of Hydro Technologies.

In its complaint, Nalco Chemical charged that defendants Girmscheid and Broge, induced by defendant Hydro Technologies, committed a breach of their respective employment agreements and misappropriated certain trade secrets from Nalco Chemical.

With its complaint, Nalco Chemical filed a motion for a temporary restraining order and a motion for expedited discovery. However, on April 17, 1992, Nalco Chemical filed a motion for preliminary injunction and withdrew its motion for a temporary restraining order. On May 1, 1992, the court conducted an evidentiary hearing on the preliminary injunction motion. The motion will be granted in part and denied in part.

A party is entitled to a preliminary injunction if it demonstrates the following:

(1) that it has no adequate remedy at law; (2) that it will suffer irreparable harm if the preliminary injunction is not issued; (3) that the irreparable harm it will suffer if the preliminary injunction is not granted outweighs the irreparable harm the defendant will suffer if the injunction is granted; (4) that it has a reasonable likelihood of prevailing on the merits; and (5) that the injunction will not harm the public interest.

*West Allis Memorial Hospital, Inc. v. Bowen*, 852 F.2d 251, 253 (7th Cir.1988); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–88 (7th Cir. 1984); *see also* Rule 65, Federal Rules of Civil Procedure.

### A.

In my opinion, the central question in the matter at bar is Nalco Chemical's likelihood of success on the merits. Accordingly, the court will begin with an assessment of the complaint, which consists of the following seven claims:

(1) that Mr. Broge has committed a breach of nondisclosure and noncompete clauses in his employment agreement with Nalco Chemical;

(2) that Mr. Broge violated the Uniform Trade Secrets Act, Wis.Stat. § 134.-90, by disclosing to and using on behalf of Hydro Technologies trade secrets that he acquired as an employee of Nalco Chemical;

(3) that Mr. Girmscheid has committed a breach of nondisclosure and noncompete clauses in his employment agreement with Nalco Chemical;

(4) that Mr. Girmscheid violated the Uniform Trade Secrets Act, Wis.Stat. § 134.90, by disclosing to and using on behalf of Hydro Technologies trade secrets that he acquired as an employee of Nalco Chemical;

(5) that Hydro Technologies has committed intentional interference with a contract between Nalco Chemical and Mr. Girmscheid;

(6) that Hydro Technologies has committed intentional interference with a contract between Nalco Chemical and Mr. Broge; and

(7) that Hydro Technologies has violated the Uniform Trade Secrets Act, Wis. Stat. § 134.90, through the acquisition of Nalco Chemical's trade secrets through "improper means."

Having considered the evidence and arguments proffered at the hearing, I believe that Nalco Chemical's preliminary injunction motion actually implicates but two of its seven claims. Nalco Chemical failed to adduce any meaningful evidence demonstrating the existence of any of trade secrets under the protection of the Uniform Trade Secret Act, Wis.Stat. § 134.90 (defining "trade secret" as, among other things, information that obtains some independent economic value from not being generally known to others).

■ Nalco Chemical did not make any effort to identify any "trade secrets" apart from its customer lists—which are not generally afforded such protection, *see Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis.2d 202, 209, 267 N.W.2d 242 (1978).

Nor did Nalco Chemical demonstrate that the general rule denying customer lists such protection was inapplicable in the present action. On the other hand, the defendants convincingly suggested that the Nalco Chemical's customers are not "secret" at all—they are well-known and readily available. At all events, while Nalco Chemical has not presently substantiated its claim that there has been a misappropriation of any trade secrets, the court does not purport to rule conclusively on that question. Accordingly, for purposes of the present motion, the court finds that Nalco Chemical has abandoned what have been designated claims (2), (4), and (7).

Nalco Chemical's claims that Hydro Technologies intentionally interfered with its employment agreements with defendants Girmscheid and Broge (designated as claims (5) and (6), respectively) relate to a *fait accompli*—defendants Girmscheid and Broge have already (lawfully or unlawfully) solicited business from Nalco Chemical's former customers; that being so, the court would be reluctant to grant injunctive relief because it might be ineffectual.

Therefore, the attention of the court has been directed to Nalco Chemical's likelihood of success on its claims that defendants Broge and Girmscheid have committed (and will continue to commit) a breach of their respective employment agreements.

**B.**

The relevant facts underlying the present motion are largely undisputed.

Nalco Chemical is a "Fortune 500" company with 6,000 employees. Through its Watergy group, Nalco Chemical sells water treatment chemicals, products, and services for industrial plants, commercial office buildings, colleges and universities, and hospitals across the nation. Its customer base is developed, maintained and serviced by field sales representatives—who occupy a variety of titles.

Defendant Hydro Technologies, consisting of but eight employees, is owned and operated by Michael Griffin, a former em-

ployee of the Watergy group of Nalco Chemical. Defendants Broge and Girmscheid are also former employees of the Watergy group of Nalco Chemical; they voluntarily resigned from Nalco Chemical on February 6, 1992, and February 5, 1992, respectively.

Defendants Broge and Girmscheid were sales employees of Nalco Chemical in southeastern Wisconsin—what the Watergy group of Nalco Chemical refers to as its "G–14 district." That district, one of twenty-four spanning the nation, represents an area in which there are several competitors marketing their respective water treatment products and services.

The evidence demonstrated that since its inception, Hydro Technologies, of Tomah, Wisconsin, has been a competitor of Nalco Chemical's Watergy group. The evidence also revealed that in December 1991, while they were still employees of Nalco Chemical, defendants Broge and Girmscheid met with Mr. Griffin of Hydro Technologies to discuss "employment opportunities." Shortly afterward, the two decided to leave the employ of Nalco Chemical for what was ostensibly a more lucrative opportunity at Hydro Technologies. The evidence showed that defendants Broge and Girmscheid were talented employees and that Nalco Chemical did not want to lose their talents. An agreement between defendants Broge and Girmscheid and Hydro Technologies was finalized not long after the December meeting; Mr. Girmscheid forthrightly admitted that he told his customers of his impending job switch as early as January 1992.

There is no question that the loss of Mr. Broge and Mr. Girmscheid has been felt by Nalco Chemical. The evidence revealed that the relationship between vendors of water treatment programs, products, and services and their customers is founded on customer goodwill—the development of a trust relationship and friendship. The Watergy group of Nalco Chemical trains its sales employees to develop that sort of relationship with customers; it then depends on them to do so on its behalf.

Mr. Broge and Mr. Girmscheid learned the basics of the sale of water treatment programs from Nalco Chemical. They both recognized the importance of developing a personal relation with their customers. Indeed, the defendants, both of whom testified during the hearing, showed themselves to be personable and articulate.

The evidence permitted a logical inference that, to the relevant Nalco Chemical customers, "Nalco Chemical" was no more or no less trustworthy than defendants Broge and Girmscheid, personally. The evidence also showed that, while they were with Nalco Chemical, defendants Broge and Girmscheid were successful in developing an effective personal relationship with their customers.

Not surprisingly, the evidence also showed that when they left Nalco Chemical for Hydro Technologies, a great many of Nalco Chemical's customers accepted their invitation to come along. Since the two joined Hydro Technologies on February 10, 1992, they have accomplished the successful transfer of allegiance of approximately twenty-one customers they had developed while they were with Nalco Chemical. The extent of their success may also be measured by the monetary "value" of those former customers of Nalco Chemical: Nalco Chemical proffered evidence to show that the loss of these customers will relate to a loss of annual sales volume of somewhere between $250,000 and $300,000.

Neither Mr. Broge or Mr. Girmscheid contested the fact that each entered a "employment agreement" with Nalco Chemical when they commenced their employment with the company: Mr. Broge on August 28, 1984, and Mr. Girmscheid on July 30, 1984. On one hand, the evidence demonstrated that the "agreement" was not the product of any hard negotiation. On the other, however, the evidence revealed that the relationship was not all one-sided. There was no dispute that Nalco Chemical invests much in employee development through training and education. Ostensibly, the agreement was intended to protect Nalco Chemical's investment in its employ-

ee—the rigorous training courses in sales and chemistry.

The two-page employment agreement entered with Nalco Chemical by both defendants Broge and Girmscheid contain, among other things, the following restrictive covenants (with emphasis added, bold in original):

> 3. Employee shall not, directly or indirectly, under any circumstances or at any time, either during the term of his employment or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account without Nalco's consent, any information acquired by him in the course of or incident to his employment relating to or *regarding the names of customers* of Nalco or Third Parties, the sales or service data of Nalco or Third Parties, furnished to him or secured by him in the course of his employment, or any other data or information concerning the business and activities of Nalco or Third Parties.
>
> \*   \*   \*   \*   \*   \*
>
> 5. Employee will not, directly or indirectly, during his employment and for the period of two (2) years immediately after its termination, *engage or assist in the same or any similar line of business, competing with the line of business now or hereafter conducted or operated by Nalco during the term of Employee's employment by Nalco,* whether as consultant, employee, officer, director, or representative of such competing business, within the United States of America, **provided, however,** that in the event that the Employee's position with Nalco immediately prior to termination is that of *field representative, then the geographic area of this non-competition covenant shall be limited to that geographic area within the United States of America for which Employee was responsible at any time during the two year period immediately preceding termination,* and **provided, further,** that in the event that any court of competent jurisdiction shall find that the above restrictions are unreasonable

with respect to their territorial extent and/or period of time involved, that such finding shall not invalidate any of the foregoing provisions with respect to the territorial extent or period of time which is reasonable, and said restrictions shall be construed to apply only to the territory and period of time so found to be reasonable by said court.

As a threshold matter, defendants Broge and Girmscheid assert that at no time during their tenure were they ever denominated as "field representatives," the descriptive term used in Nalco Chemical's employment agreement. The evidence, however, demonstrated that irrespective of the titles they might have had as employees of Nalco Chemical, they were "field representatives" in the contemplated meaning of that description. Notwithstanding the variance of titles within the company, there is no doubt that both Mr. Broge and Mr. Girmscheid represented Nalco Chemical in "the field"—a term obviously intended to distinguish the location of Nalco Chemical's customers from the location of Nalco Chemical's offices.

Another provision of the form agreement, a copy of which has been set forth in its entirety as an appendix, relates to an employee's obligation to return books and manuals to Nalco Chemical after the termination of his or her employment. There was no evidence to suggest that defendants Broge and Girmscheid retained any such materials in violation of their employee agreement. Indeed, none of Nalco Chemical's witnesses testified that they believed defendants Broge or Girmscheid were presently in possession of any of Nalco Chemical's allegedly proprietary materials. Accordingly, that provision is not at issue.

There was some disagreement as to whether defendants Broge and Girmscheid had been assigned any specific territories within the G–14 district. Nalco Chemical's evidence consisted of the testimony of John Stewart, those defendants' supervisor (district manager), and John Frauenhofer, one of their former coworkers, who stated that defendants Broge and Girmscheid had been given specific territorial assignments with-

in the G–14 district, notwithstanding what appeared to be a sales office policy permitting sales representatives to pursue, to a limited extent, sales to specific customers beyond their assignment.

However, the defendants made much of apparent variations in the various materials which Nalco Chemical used at one time or another to purport to designate the respective territorial assignments of defendants Broge and Girmscheid. Those defendants denied that Nalco Chemical had ever assigned them any specific territory. However, the court has little trouble identifying the realistic territorial limits for the sales responsibilities of defendants Broge and Girmscheid: in the broadest sense, they worked the area encompassed by the G–14 district.

Irrespective of Nalco Chemical's difficulties in articulating the bounds of those defendants territorial assignments *within* G–14, defendants Girmscheid and Broge admitted that they were now calling upon—and winning over to Hydro Technologies—the accounts that they had previously been calling upon as sales representatives of Nalco Chemical. Interestingly, Mr. Girmscheid had been a technical service representative prior to March 1991—a position in which he had responsibility for the *entire* G–14 district. While Mr. Girmscheid testified that he was never assigned a territory during his tenure as a sales representative, he testified that it was his understanding that he did have "customers"—some of whom he had been "given" (for lack of a better word) by Mr. Broge. Mr. Broge also testified that he did not think he had been assigned territorial boundaries within the G–14 district; he suggested that his "territory" was simply where his accounts were. Moreover, he suggested that his "territory" defied boundaries to the extent that many of his accounts were developed from referrals from other of his Nalco Chemical customers. The reasonable inference from this is that Mr. Broge was possessed of substantial knowledge of Nalco Chemical's customers and potential customers throughout the entire G–14 district.

The court finds that the record permits no other conclusion than that Mr. Girmscheid did indeed *assume* a reasonable, recognized territorial responsibility as a Nalco Chemical sales agent—*regardless* of whether one had ever been assigned to him with minute particularity; the same is true for Mr. Broge. That other Nalco Chemical employees might also have worked within the territories assumed by the two does not alter this conclusion. Thus, the "geographic area" for which each had responsibility, in the contemplation of the sales agreement, consisted of the territory within which each of those defendants actually worked. Such territory was generally known to the defendants and to their employer, Nalco Chemical.

Defendants Broge and Girmscheid described their relationship with their present employer as follows: they receive no salary; they receive a commission equal to 31 per cent of sales; they also testified that they have an agreement under which they split their commissions with each other. (Mr. Broge testified that this "team effort" assures better service for their customers.) Each testified that they had collectively generated approximately $80,000 in sales for their new employer since February 10, 1992, when they joined it.

Other testimony by representatives of former Nalco Chemical customers (the Grand Avenue Mall and Columbia Hospital), who are now Hydro Technology customers, corroborated Nalco Chemical's assertion that the relationship between vendors of water treatment programs and services and their customers is founded on trust.

### C.

### 1.

The Wisconsin legislature has enacted a statute regulating the use of restrictive covenants in employment contracts:

A covenant by an assistant, servant or agent not to compete with his employer or principal during the term of the employment or agency, or thereafter, within a specified territory and during a speci-

fied time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant or performance as would be a reasonable restraint. Wis.Stat. § 103.465. All parties agree that this statute governs the present dispute.

The Wisconsin supreme court has also adopted supplemental canons of construction for employment contracts containing restrictions against competition (covenants not to compete):

> These restrictions are prima facie suspect; they must withstand close scrutiny to pass legal muster as being reasonable; they will not be construed beyond their proper import or further than the language of the contract absolutely requires; they are to be construed in favor of the employee.

*Streiff v. American Family Insurance Co.*, 118 Wis.2d 602, 610–11, 348 N.W.2d 505 (1984); *Zimmermann v. Brennan*, 78 Wis.2d 510, 514–15, 254 N.W.2d 719 (1977); *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis.2d 202, 218–19, 267 N.W.2d 242 (1978).

What has emerged is a five-part test that such restrictions or covenants must withstand in order to survive scrutiny. Under Wisconsin common law and Wis.Stat. § 103.465, a covenant not to compete must (1) be necessary for the protection of the employer, that is the employer must have a protectable interest justifying the restriction imposed on the activity of the employee; (2) provide a reasonable time limit; (3) provided a reasonable territorial limit; (4) not be harsh or oppressive as to the employee; and (5) not be contrary to public policy.

*Streiff*, 118 Wis.2d at 613–14 n. 5, 348 N.W.2d 505; *Lakeside Oil Co. v. Slutsky*, 8 Wis.2d 157, 163, 98 N.W.2d 415 (1959); *Chuck Wagon Catering, Inc. v. Raduege*, 88 Wis.2d 740, 751, 277 N.W.2d 787 (1979).

■ Ultimately, the reasonableness of Nalco Chemical's employment agreement turns on the totality of the facts and circumstances surrounding it. *Hunter of Wisconsin, Inc. v. Hamilton*, 101 Wis.2d 460, 471, 304 N.W.2d 752 (1981).

### 2.

There is no question that Nalco Chemical's employment agreement is necessary for the protection of its legitimate business interests. The evidence readily demonstrated that Nalco Chemical relies on its sales representatives to develop a relationship of friendship and trust with its customers, who, in turn, come to rely and depend upon a particular sales representative. *See Chuck Wagon Catering*, 88 Wis.2d at 750–51, 277 N.W.2d 787; *Abbott Laboratories v. Norse Chemical Co.*, 33 Wis.2d 445, 465–68, 147 N.W.2d 529 (1967); *Lakeside Oil*, 8 Wis.2d at 163, 98 N.W.2d 415 (acknowledging that a salesman's "personality and salesmanship" gives him "control or influence" over his employer's customers, who develop confidence in him personally). This "customer goodwill" is considered a protectable business asset. *Chuck Wagon Catering*, 88 Wis.2d at 751, 277 N.W.2d 787.

Wisconsin law permits a company to protect by contract its "stock of customers" in recognition of "the significant impact that repeated and exclusive contact by a salesperson with a company's customers can have on customer loyalty" and the fact that a salesperson is generally the company's "main source of contact" with customers. *See Chuck Wagon Catering*, 88 Wis.2d at 753, 277 N.W.2d 787; *Lakeside Oil*, 8 Wis.2d at 163, 98 N.W.2d 415.

The evidence clearly established that such "customer goodwill" is a highly valuable business asset for those who market water treatment product and services. Indeed, the evidence suggested that the *very* reason defendants Broge and Girmscheid were desirable to Hydro Technologies was the customer goodwill they had developed during their employment as Nalco sales employees. They were Nalco Chemical's "main source of contact" with its customers; from the contacts they made as Nalco Chemical's sales employees, defendant Broge and Girmscheid had fostered cus-

tomer goodwill—loyalty and trust. Because it employed those defendants to develop consumer goodwill on its behalf, Nalco Chemical is now entitled to protect (in an otherwise reasonable covenant) that goodwill as a business asset. Accordingly, Nalco Chemical is entitled to some degree of assurance that its former employees take "no more than [their] experience and intellectual development" with them when they resign. *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis.2d 202, 214, 267 N.W.2d 242 (1978).

There is no question that the two-year time limitation is reasonable, *see, e.g., Lakeside Oil*, 8 Wis.2d at 164–65, 98 N.W.2d 415 (two-year limitation was reasonable to "obliterate in the minds of the plaintiff's customers the identification formed during the period of the defendant's employment"); *Chuck Wagon Catering*, 88 Wis.2d at 754, 277 N.W.2d 787. Moreover, it is necessary to ensure that defendants Broge and Girmscheid, who were paid by Nalco Chemical to develop customers, are "not now ... allowed to take such customers away" before it has "a reasonable chance to keep them." *Lakeside Oil*, 8 Wis.2d at 164, 98 N.W.2d 415. In addition, the court is satisfied that the restrictions imposed in Nalco Chemical's employment agreement are neither "harsh or oppressive as to the employee[s]" or "contrary to public policy."

Even if the restrictions of their employee agreement with Nalco Chemical are enforced, defendants Broge and Girmscheid remain free to develop their own customers in territories apart from those they worked on behalf of Nalco Chemical; moreover, they may return to solicit their former Nalco Chemical customers after two years.

Furthermore, the record demonstrated that there is not any want of competition in the water treatment products and services industry as would cause the court to fear for the welfare of consumers. *Chuck Wagon Catering*, 88 Wis.2d at 755, 277 N.W.2d 787 (covenant not "unreasonable as to the general public" where it did not create a shortage or monopoly); *Lakeside Oil*, 8 Wis.2d at 167, 98 N.W.2d 415. Ac-

cordingly, the court is satisfied that the enforcement of the agreement would not be contrary to public policy.

The remaining question is the reasonableness of the geographic limitation in the covenant, concededly the most difficult question. The defendants suggest that Nalco Chemical's inability to articulate the territorial assignments of defendants Broge and Girmscheid with detailed precision precludes Nalco Chemical from establishing that its employment agreement contains the requisite reasonable territorial limit. The court cannot agree. The record disclosed that, irrespective of the apparent lack of particularized, formal assignments from their supervisor, defendants Broge and Girmscheid understood where their sales territories were located and they *assumed* their duties to solicit in such areas. The lack of specificity of Nalco Chemical's territorial assignments within the G–14 district does not warrant the conclusion that the territories were unreasonable either as to size or location.

The employment agreement, which restricts defendants Broge and Girmscheid from soliciting customers for Hydro Technologies within the "geographic area" for which they formerly had "responsibility," encompasses an area no larger than that in which those defendants actually serviced as Nalco Chemical employees. *See Chuck Wagon Catering*, 88 Wis.2d at 754, 277 N.W.2d 787; *Pollack v. Calimag*, 157 Wis.2d 222, 238, 458 N.W.2d 591 (Ct.App. 1990). That being so, the geographic restriction is reasonable. Moreover, any danger that the geographic scope of a restrictive covenant may extend beyond the territory that the employees serviced personally is not dispositive where, as here, those employees "had access to vital information ... which was not limited to those [customers] whom they serviced personally." *Hunter of Wisconsin, Inc. v. Hamilton*, 101 Wis.2d 460, 468–69, 304 N.W.2d 752 (1981); *see also Fields Foundation Ltd. v. Christensen*, 103 Wis.2d 465, 474, 309 N.W.2d 125 (Ct.App.1981) (there is no fixed rule preventing the protection of an employer against the improper use of informa-

tion on customers with whom the departing employee did not have "actual contact").

That is not to say that the geographic limitation is readily capable of description for purposes of the preliminary injunction. The testimony at the hearing suggested that no one knows better than defendants Broge and Girmscheid themselves the geographic territories in which they worked. In fact, in light of the evidence, the geographic restriction contained in the employment agreement might fairly be construed as follows: defendants Broge and Girmscheid worked in a reasonably small and particular geographic area as Nalco Chemical employees, and they cannot contact persons in that area for two years. Basically, that will be the practical scope of the injunction: the enforcement of the employment agreement contemplates that defendants Broge and Girmscheid be enjoined from contacting customers or potential customers of Nalco Chemical in Milwaukee County, Racine and Kenosha Counties (east of Interstate 94), and Washington County.

At all events, upon review of the evidence, the court is satisfied that Nalco Chemical has demonstrated the enforceability of its employment agreement under Wis.Stat. § 103.465. Defendants Broge and Girmscheid conceded that they have solicited their former Nalco Chemical customers for their new employer, Hydro Technologies. (The record demonstrated that the two had already captured twenty-one of their former customers.) Moreover, at the hearing, the defendants revealed their intention to continue to do so absent a court order. The court finds that Nalco Chemical has a reasonable likelihood of prevailing on the merits of its breach of contract claims against defendants Broge and Girmscheid.

### D.

The court also finds that Nalco Chemical has fulfilled its obligation to satisfy the remaining elements of the preliminary injunction standard.

The court is satisfied that Nalco has no adequate remedy at law for the continued loss of the customer goodwill defendants Broge and Girmscheid had developed on its behalf. In addition, the court is persuaded that Nalco Chemical will suffer irreparable harm if the preliminary injunction is not issued to prevent the continued solicitation of its customers by its former employees. Moreover, the irreparable harm that Nalco Chemical will suffer if the preliminary injunction is not granted—Hydro Technologies' appropriation of customer goodwill that was developed through Nalco Chemical's expense and efforts—outweighs the irreparable harm that defendants Broge and Girmscheid—who are free to hawk Hydro Technologies water treatment products and services elsewhere—will suffer if the injunction is granted.

The court is also convinced that the issuance of an injunction enforcing the terms of Nalco Chemical's employment agreement with defendants Broge and Girmscheid will not harm the public interest.

### ORDER

Therefore, IT IS ORDERED that Nalco Chemical's motion for preliminary injunction be and hereby is granted in part.

IT IS ALSO ORDERED that defendant Daniel Girmscheid be and hereby is enjoined and restrained from committing a breach of his employment agreement with plaintiff Nalco Chemical Company, as provided in this decision and order.

IT IS FURTHER ORDERED that defendant Thomas Broge be and hereby is enjoined and restrained from committing a breach of his employment agreement with plaintiff Nalco Chemical Company, as provided in this decision and order.

### APPENDIX

### NALCO CHEMICAL COMPANY EMPLOYMENT AGREEMENT

*THIS AGREEMENT* made and entered into by and between Thomas S. Broge (hereinafter called "Employee") and Nalco Chemical Company, a Delaware corporation with its principal office in Illinois, (hereinafter called "Nalco"),

*WITNESSETH;*

*WHEREAS,* Employee is employed by Nalco and occupies a trusted position whereby he is enabled to obtain confidential information concerning the business of Nalco as well as confidential information concerning the business of Nalco affiliates, subsidiaries, prospective customers, customers, consultants, licensors, licensees and other business associates (hereinafter collectively called "Third Parties"), including customer lists, sales and service data, trade secrets and other confidential information concerning the processes, products and activities of Nalco and Third Parties; and

*WHEREAS,* Employee may during his employment make or acquire interests in inventions as herein defined; and

*WHEREAS,* Employee represents that his training and experience have been such that he may earn a livelihood through employment by commercial firms which do not compete with Nalco; and

*WHEREAS,* Nalco and Employee agree that the covenants and agreements hereinafter set forth are a part of Employee's employment:

*NOW, THEREFORE,* in consideration of Employee's employment and payment of compensation by Nalco, and in view of Employee's trusted position with Nalco, it is agreed as follows:

1. During his employment by Nalco, Employee shall devote all his time and attention and give his best efforts and skill exclusively to the interests of Nalco during reasonable business hours and shall perform such services for Nalco as may from time to time be assigned to him. Employee shall in all respects use his best efforts to conserve and promote the best interests and welfare of Nalco.

2. Employee shall not, directly or indirectly, under any circumstances or at any time, either during his employment by Nalco or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account, without Nalco's consent, any information acquired by him in the course of or incident to his employment, relating to or regarding any inventions, discoveries, improvements, machines, devices, processes, products, formulae, designs, projects, mixtures and/or compounds, whether patentable or not, (hereinafter collectively called "technical information") that may have been, are now, or may hereafter during the term of his employment by Nalco be made, used, devised, considered or investigated by or for Nalco or Third Parties, and he will at all times keep secret and hold inviolate said technical information, the Employee hereby agreeing that all the foregoing has been and shall be received by him as confidential communications; **provided,** however, that the obligations of this paragraph shall not apply in the event and to the extent that the aforesaid matters are or become generally known to and available for use by the public otherwise than by the act or omission of Employee, except that Employee shall in no event, at any time, without Nalco's consent, disclose any identity or correlation between matters publicly known and available and Nalco's technical information or said Third Parties' technical information.

3. Employee shall not, directly or indirectly, under any circumstances or at any time, either during the term of his employment or after its termination, communicate or disclose to any person, firm, association or corporation, or use for his own account, without Nalco's consent, any information acquired by him in the course of or incident to his employment relating to or regarding the names of customers of Nalco or Third Parties, the sales or service data of Nalco or Third Parties, furnished to him or secured by him in the course of his employment, or any other data or information concerning the business and activities of Nalco or Third Parties.

4. All customer lists, sales and service manuals and data, and all other writings, records and documents made by

or coming into the possession of Employee in the course of or incident to his employment, concerning any of the matters referred to in paragraphs 2, 3 or 6 of this Agreement, or otherwise concerning the business or activities of Nalco or Third Parties, shall be returned to Nalco upon termination of Employee's employment or on request of Nalco at any other time.

5. Employee will not, directly or indirectly, during his employment and for the period of two (2) years immediately after its termination, engage or assist in the same or any similar line of business, competing with the line of business now or hereafter conducted or operated by Nalco during the term of Employee's employment by Nalco, whether as consultant, employee, officer, director, or representative of such competing business, within the United States of America, **provided, however,** that in the event that the Employee's position with Nalco immediately prior to termination is that of field representative, then the geographic area of this non-competition covenant shall be limited to that geographic area within the United States of America for which Employee was responsible at any time during the two year period immediately preceding termination, and **provided, further,** that in the event that any court of competent jurisdiction shall find that the above restrictions are unreasonable with respect to their territorial extent and/or period of time involved, that such finding shall not invalidate any of the foregoing provisions with respect to the territorial extent or period of time which is reasonable, and said restrictions shall be construed to apply only to the territory and period of time so found to be reasonable by said court.

6. Employee will communicate and disclose in writing to his superior in Nalco, or to such other person as may be designated by Nalco, both during his employment and thereafter, all of those inventions, discoveries, improvements, machines, devices, designs, processes, products, treatments, formulae, mixtures and/or compounds, whether patentable or not, as well as patents and patent applications (all the foregoing being hereinafter collectively called "inventions") made, conceived, developed or acquired by Employee or under which he acquired the right to grant licenses or become licensed, whether alone or jointly with others, during his employment by Nalco. All his right, title and interest in, to and under such inventions, including licenses and right to grant licenses, shall be the sole property of Nalco and Employee hereby assigns and agrees to assign the same to Nalco. Any invention disclosed by Employee to anyone within one (1) year after termination of his employment with Nalco, which relates to any matters pertaining to, applicable to, or useful in connection with, the business of Nalco shall be deemed to have been made or conceived or developed by Employee during his employment by Nalco, unless proved by him to have been made and conceived and developed after termination of his employment with Nalco.

7. As to all such inventions as defined in paragraph 6, Employee will, upon request of Nalco, during his employment or thereafter:

(a) execute and deliver all documents which Nalco shall deem necessary or appropriate to assign, transfer and convey to Nalco, all his right, title and interest in and to such inventions, and enable Nalco to file and prosecute applications for Letters Patent of the United States and any foreign countries on inventions as to which Nalco wishes to file patent applications, and

(b) do all other things (including the giving of evidence in suits and other proceedings) which Nalco shall deem necessary or appropriate to obtain, maintain, and assert patents for any and all such inventions and to assert its rights in any inventions not patented.

8. All expenses incident to any action required by Nalco or taken in its behalf pursuant to the terms of this agreement shall be borne by Nalco, including a reasonable payment for Employee's time and expenses involved in case he is not then in Nalco's employ, which payment for his time shall in no event amount to more than double his salary for a similar period of time at the rate being paid to such Employee by Nalco at time of termination of his employment.

9. It is expressly understood and agreed that the covenants, agreements and restrictions undertaken by or imposed on Employee hereunder, which are stated to exist or continue after termination of Employee's employment with Nalco, shall exist and continue irrespective of the method or circumstances of such termination.

10. Employee and Nalco agree that if any of the covenants, agreements or restrictions on the part of Employee are held to be invalid by a court of competent jurisdiction, such holding will not invalidate any of the other covenants, agreements and/or restrictions herein, it being intended that the covenants, agreements and/or restrictions herein contained shall be severable and that the invalidity of one shall not invalidate any others.

11. This Agreement applied from the time of beginning of Employee's service with Nalco. It is understood that this Agreement does not create or provide for any period of employment of Employee by Nalco, and that said employment shall be only so long as the same is mutually agreeable to both parties, unless an employment agreement shall have been entered into separate and apart from this Agreement.

12. As used herein, in case of female Employees signing this Agreement, the masculine shall mean the feminine. The references herein to affiliates of Nalco mean corporations, domestic or foreign, more than twenty-five per cent (25%) of whose voting stock is owned, directly or indirectly, by Nalco.

13. This Agreement shall inure to the benefit of the successors and assigns of Nalco. Insofar as the same may be applied thereto, the terms and provisions hereof shall apply to and bind Employee's heirs, legal representatives and assigns.

*IN WITNESS WHEREOF* Employee has read, understood and has duly executed this instrument and Nalco has caused this instrument to be duly executed by its authorized officer.

(s) Thomas S. Broge
Employee's Signature
(s) Willowbrook, Illinois
Place of Signature
(City and State)
08–28–84
Date of Signature